[No. 4092.   Decided March 21, 1902.]

EMMA MORRISSEY, *Respondent*, v. JAMES E. FAUCETT, *Appellant.*

PLEADING — AMENDMENT AT TRIAL.

The action of the court in permitting plaintiff at the close of the testimony to amend her complaint so as to correspond to the proof was not error, where defendant's answer theretofore filed had negatived the truth of the matters set up in the amendment and evidence upon both sides had been directed to that issue.

WORK AND LABOR — CONTINUOUS CONTRACT — LIMITATIONS.

Where services are rendered under a contract for an indefinite time, with no period of payment specified, the employment is a continuous one and the statute of limitations will not begin to run against an action to recover compensation until the services are ended.   (*Ah How v. Furth*, 13 Wash. 550, followed.)

SAME — TRIAL — CROSS-EXAMINATION.

In an action by plaintiff to recover for services rendered about the house and farm of her brother, with whom she lived for a number of years after attaining majority, where she had testified that during a portion of the time a renter had charge of the cows and was supposed to do the milking, but that she sometimes voluntarily helped him, it was not error for the court to exclude cross-examination as to whether the work she did by way of milking the cows while a renter had charge was voluntary on her part and not required by her brother.

SAME — SERVICES BY SISTER FOR BROTHER — IMPLIED CONTRACT — QUESTION FOR JURY.

Where domestic services are rendered by one member of a family to another, it is not necessary in an action to recover compensation to prove the terms of a direct and positive contract,

but proof may be made of words and conduct of the parties and of circumstances from which the inference may follow that there was an understanding the services were not to be gratuitous; and it is for the jury to say from such evidence whether there was in fact such an understanding or agreement.

SAME — TIME OF BEGINNING SERVICES — EVIDENCE.

In an action by a sister to recover for services rendered her brother after she had attained her majority, where the evidence showed she had been living with him prior thereto as a member of his family, and she had testified to a conversation had with her brother on the subject of services soon after the date of her majority, but was unable to fix the date certainly, and on cross-examination did not, in terms, deny that it might have been some months later, it was for the jury to say, in view of all the testimony, whether an understanding existed that she was to receive compensation from the time she was twenty-one years of age.

Appeal from Superior Court, King County.—Hon. ARTHUR E. GRIFFIN, Judge. Affirmed.

*Lewis, Hardin & Albertson,* for appellant.

*James Hart* and *Allen, Allen & Stratton,* for respondent.

The opinion of the court was delivered by

HADLEY, J.—Appellant and respondent are brother and sister. Appellant is some years older than respondent. Their father died when respondent was about sixteen years of age. For some years previous to his death the father was ill and unable to superintend his farm, and appellant took entire charge of the farm from the time he was about sixteen years of age. Some time before the death of the father he transferred the farm to the appellant by deed, and also gave him personal property connected with the farm. After the death of the father the family consisted of appellant, respondent, and their mother. Respondent lived with appellant and her mother as a member of the family from the time her father died

until she was twenty-one years of age. Meanwhile she attended school and assisted in ordinary duties about the house and farm. Respondent testifies that she quit attending school when she was nineteen years of age, but other witnesses say they think she attended school until she was twenty-one years of age. In any event, however, she continued to reside with the family until she was twenty-one years old, and discharged duties as aforesaid, receiving meanwhile her board, lodging, and clothes. Soon after she became twenty-one years of age,—the time is not definitely fixed,—respondent testified that she spoke to her brother (appellant) about her work in the future. She said:

"I told him I was twenty-one now, and I would have to go out and look out for myself; that I would have to look around to earn my living; and he wanted me to go on there and do the work just the same as I had, and he would make it all right with me if I would stay; and I did so, and I took his word that he would do it. He said to me to go on and do the work just the same as I had been doing, and he would make it all right with me; he would pay me for my work. There was no certain time,—no date set when he was to pay me."

In the course of her testimony, respondent also testified to other conversations between herself and appellant when the subject of compensation for her work was mentioned. There was other testimony to the effect that appellant said in the presence of respondent that she would be paid for all she was doing. One witness also testified to a conversation between himself and appellant when respondent was not present, as follows:

"We were right there,—raised there, boys together; and I was telling him how his sister worked to help him along and what a good girl she was, and he said, 'Yes, there never was a better in the world; and I calculate to do what is right by Emma and pay her for her work.' "

Respondent continued to reside with appellant from the time she became twenty-one years of age, in October, 1892, until the month of July, 1899, when she left, about which time she was also married. During said period of more than six and two-thirds years she did the principal work required in the farmhouse of appellant. Her mother helped some about the house, but she was an elderly lady, being more than seventy years of age at the time of the trial, and was unable to do as much housework as she otherwise might have done. During most of the time appellant kept from twelve to twenty, and sometimes even more, milch cows, which it was necessary to milk every day. It was necessary to milk the cows at an early hour every morning, so that the milk could be shipped to Seattle by a train which left early in the morning. It was the rule for those who milked the cows to get up about four o'clock in the morning and commence the milking. Respondent helped to milk the cows during most of the time. There was a time when the management of the cows was with a renter, and there is evidence that respondent assisted about the milking even then. She was, however, not asked to do so by appellant, and she seems to have voluntarily rendered such assistance. This period did not, however, cover a very long time; and even during that period respondent was daily doing the usual work about the house, and was also doing work outside upon a portion of the farm not rented. The evidence shows that during the six and two-thirds years the respondent was never away from the farm for perhaps more than two or three days at a time,—at most but a few days,—except once, when she was gone five weeks on a visit. It is sufficient to say that the services were rendered with but little interruption for such a long period. Respondent worked about the farm, doing all

kinds of work required upon the farm, except to plow. Appellant himself admits that she was very industrious and did valuable and faithful service. In the house she did the cooking, washing, ironing, and all other house-work except what assistance her mother gave her. Outside she helped to plant the crops, hoed, dug, and sacked po-tatoes; raked and bunched hay; helped to put up the hay and mow it away, and drove the horses that drew the fork which pulled up the hay. She testified that she milked eight and ten, and sometimes fifteen, cows, twice a day. She fed and raised calves, fed pigs, harrowed, ran a clod machine, set hop poles, laid hops, bunched and picked them, shoveled hops into the press when they were baled, helped sew the bales, and attended the press when they were baled. She generally got up before four o'clock in the morning and worked until eight or nine at night. She pruned the orchard, did the pumping when the orchard was sprayed, and helped make the spraying material. Much of the time there were two hired men, for whom she cooked, besides the members of the family. Neighbors testified that they had seen respondent doing many of the things above enumerated, and in fact had seen her doing about all kinds of work required upon the farm, except to plow. During the time mentioned appellant furnished respondent her board and lodging and some of her clothes. Another brother, in Alaska, furnished her money to buy some clothing. Occasionally appellant handed her some money, with which she bought some clothing for herself, some for her mother, and also needed things for the house. She occasionally received a little money from the pro-ceeds of the sale of some poultry, the raising of which had been under her special care, which money was spent much in the same manner as that before mentioned. She testi-

fied that the only payment ever made on account of her
services was a payment of $30 made just as she was leav-
ing home, after she had quit rendering services; and fur-
ther, that she never asked for payment before. She alleges
that her services were reasonably worth $25 per month, in
addition to her board and lodging, and that the whole
thereof is unpaid, except said sum of $30. She brought
this suit to recover said balance, and demands judgment
in the sum of $1,982.50. The defense is that the respond-
ent is the sister of appellant and lived with appellant as a
member of his family, with no agreement to pay for her
services, and with no expectation that she should be com-
pensated therefor. The statute of limitations is also inter-
posed as a defense. The cause was tried by a jury and a
verdict returned for respondent in the sum of $1,982.50.
Appellant moved for a new trial, which was overruled;
and thereafter judgment was entered upon the verdict of
the jury for the full amount thereof, together with interest
and costs. From said judgment his appeal is taken.

It is assigned as error that the court sustained the de-
murrer of respondent to appellant's plea of the statute of
limitations, and admitted testimony as to services rendered
prior to three years before the commencement of the action.
This assignment raises the question of the application of
the statute of limitations to a contract of employment for
an indefinite time, when no time for payment has been
specified. We are aware that there is conflict of authority
upon this subject, and the authorities cited by appellant are
to the effect that, if the hiring can be regarded from year
to year, the services for each year should be treated as a
separate item and the statute applied accordingly, or, if
there is anything to make it appear that the hiring may
have been from month to month, each month should be so

regarded. However, in *Ah How v. Furth,* 13 Wash. 550 (43 Pac. 639), this court announced a different rule. In that case the services were rendered under a contract of employment for an indefinite period. The services continued for a number of years, and some payments were made meanwhile. It is true, the trial court in that case found that at no time prior to the beginning of the suit did a period of three years elapse between the dates of payments or credits; but in its interpretation of the contract and the statute of limitations as applied thereto, this court said, at page 552:

"We think that the contract of service was a continuous one, and that the statute of limitations did not begin to run until the completion of the service."

The authorities there cited sustain the rule announced, and are as follows:  *Carter v. Carter,* 36 Mich. 207; *Grave v. Pemberton,* 3 Ind. App. 71 (29 N. E. 177); *Knight v. Knight,* 6 Ind. App. 268 (33 N. E. 456); *Taggart v. Tevanny,* 1 Ind. App. 339 (27 N. E. 511).

In addition to the above, respondent cites *Jackson v. Mull,* 6 Wyo. 55 (42 Pac. 603), which is also in point. The rule having been announced in *Ah How v. Furth, supra,* and being sustained by authority, we do not deem it wise to depart therefrom. The contract alleged in this case was for an indefinite time, and no time of payment was specified. The services were therefore continuous, within the above rule, and the statute did not begin to run until the services ended. The court therefore did not err in overruling the demurrer and in admitting the testimony.

It is next assigned that the court erred in permitting respondent to amend her complaint at the close of the testimony. Immediately after the close of the testimony the following occurred:

"Mr. Allen: If your honor please, plaintiff asks leave of court to amend her complaint by adding to paragraph 1 the following: 'For which said work and labor the defendant promised and agreed to pay the plaintiff, which said promise was made prior to plaintiff performing said work and labor.' That said amendment simply conforms to the proof introduced in this case."

Appellant objected to the amendment being made, but the court permitted it, and appellant thereupon excepted. In *Hulbert v. Brackett,* 8 Wash. 438 (36 Pac. 264), an application was made to amend the complaint during the introduction of the testimony. The court held that it was within the discretion of the trial court to permit the amendment; that no different answer was required, and the defendant was in no way taken by surprise. In this case appellant's answer already filed negatived specifically the truth of the matters set up in the amendment, and evidence upon both sides had been directed to that issue. There could have been no surprise. The most that appellant could have asked would have been for time to introduce further testimony, which was not done. To the same effect are *McDonough v. Great Northern Ry. Co.,* 15 Wash. 244 (46 Pac. 334), and *Allend v. Spokane Falls & Northern Ry. Co.,* 21 Wash. 324 (58 Pac. 244). The court did not commit error in permitting the amendment under the circumstances.

It is assigned as error that the court refused to permit respondent to answer on cross-examination whether the work she did by way of milking cows while a renter had charge of them was voluntary on her part, and not required by appellant. We think it was not material. She had already testified that the renter was supposed to do the milking. The following had appeared in her examination:

"Question: He was supposed to do the milking, was he not? Answer: The renter? Q. Yes, the renter. A. Yes, sir. Q. You would go there voluntarily and help him milk? A. When I didn't have anything else to do, I would go and help milk."

We think it had already sufficiently appeared that at such times as she was milking cows which were under the renter's charge she was not working for appellant, or upon his request. The point must have been sufficiently clear to the jury without further examination on that line, and we think the court did not err in excluding the further testimony sought.

It is assigned as error that the court instructed the jury to the effect that it is not necessary, in order that respondent may recover, that she shall show an expressed promise to pay for the services, but that it is sufficient for her to show from facts and circumstances that there was an understanding and agreement. One instruction, which, in substance, embodies the above statement of law, concludes as follows: "She may show an implied promise on the part of the defendant to pay for such services." It is urged that the instruction, in effect, told the jury that no agreement or understanding was necessary, and that she could recover upon an implied contract in law following from the mere fact that the services were rendered. The court did not say, however, that no contract or understanding is necessary, but that no "expressed promise to pay" is necessary, if from facts and circumstances it is shown that there was an agreement. The first quoted words above do not say that she can recover upon a mere implied contract, but that she may *"show* an implied promise." The reasonable interpretation of the words, when considered in connection with the entire instruction, together with others given, is that she may show facts and circumstances

from which the implication or inference may follow that
there was an agreement.    We think the instructions,
taken as a whole, must have made the point clear to the
jury that there could be no recovery without an agree-
ment or understanding that respondent was to be paid for
her services, and that she could not recover from the mere
fact that the services were rendered and accepted.    In fact,
the court so stated to the jury in words as direct and plain
as could have been used.    They were told, in effect, that
it was for the jury to say whether an understanding or
agreement existed by reason of the facts and circumstances
and the acts and conversations of appellant.    Appellant
contends that respondent must show an express contract
before she can recover; that is to say, a direct and positive
agreement, in terms, to pay for the services rendered. The
authorities are not altogether harmonious upon this sub-
ject.    It is a rule universally recognized that, when the
services are rendered by one who is a member of the family
of the employer, the law will not imply a contract to pay
for the services from the mere fact that they have been
rendered upon the one hand and benefits thereof received
upon the other, as in the case of strangers.    This is also
held to be the rule when there is no actual blood relation-
ship existing between the parties, provided they sustain
to each other the ordinary relations of members of the
same family.    It has been held, however, that when the
family relationship exists it is not necessary to prove the
terms of a direct and positive contract, but that proof
may be made of words, acts, and conduct of the parties,
and circumstances from which the inference may follow
that there was an understanding that the services were not
to be rendered gratuitously; that when such is the case
there is a contract upon which the value of the services

can be recovered, and it is for the jury to say, from all the conduct of the parties and from the circumstances in evidence, whether there was in fact such an understanding or agreement. This rule is sustained by the following: *Young v. Herman,* 97 N. C. 280 (1 S. E. 792); *Collins v. Williams,* 21 Ind. App. 227 (52 N. E. 92); *Dash v. Inabinet,* 53 S. C. 382 (31 S. E. 297); *Hart v. Hess,* 41 Mo. 441; *Murrell v. Studstill,* 104 Ga. 604 (30 S. E. 750), *Smiley v. Scott,* 77 Ill. App. 555; *Tumilty v. Tumilty,* 13 Mo. App. 444; *McGarvy v. Roods,* 73 Iowa, 363 (35 N. W. 488).

The rule recognized in the above cases clearly appears in the following from the opinion in *Murrell v. Studstill, supra,* at page 751 (104 Ga. 608).

"The services rendered by the plaintiff in error in this case were not only such as a grandchild would naturally render from love and affection in waiting upon an infirm, old grandparent, but she also performed the services of a common servant, in cooking, washing, and doing labor in the field. By such services she saved the grandparent expenses that he would otherwise have had to incur in the employment of labor, and thus enhanced the value of his estate. While there was no express contract proved, yet there was enough in this case to submit it to the jury, and to leave it to this tribunal to determine, in the language of this court in the case of *Hudson v. Hudson,* above cited, whether or not the surrounding circumstances revealed by the evidence 'plainly indicate that it was the intention of both parties that compensation should be made, and negative the idea that the services were performed merely because of that natural sense of duty, love and affection arising out of this relation' of grandparent and grandchild."

Also in *Dash v. Inabinet, supra,* at page 298 (53 S. C. 386) of the opinion, as follows:

"In this case, it is very apparent that there was no direct and positive testimony of any agreement between plaintiff and intestate as to compensating her for her services; for when the plaintiff was asked whether there was any such understanding with her father, the question was objected to, and very properly ruled incompetent, under section 400 of the Code. The plaintiff was, therefore, forced to rely on such other circumstances as she was able to prove, from which the jury might infer that there was an agreement for compensation. It will be observed that we use the word 'might', and not the word 'should', for it is not for us to say what inference the jury should draw from the testimony, but only to determine whether there was any testimony from which the jury might infer that there was a contract. Without discussing the testimony above stated, or indicating any views which might be taken of it, or suggesting any inferences that might be drawn from it, as that might prove prejudicial to one or the other of the parties, it is sufficient for us to say, that there was testimony from which the jury might infer that there was a contract; but whether the testimony was sufficient to warrant such an inference, we have neither the power nor the disposition to say; and we must not be regarded as expressing, or even intimating, any opinion whatever as to the sufficiency of the evidence, as that is a matter exclusively for the jury."

We believe the rule above stated is wholesome and just, and we shall adopt it here. The court's instructions were in harmony therewith, and we think there was no error therein which could have misled the jury. There was evidence in this case of a direct promise to pay, which was, however, denied by appellant. It therefore became the duty of the court to submit the question to the jury whether it was the understanding between the parties that the services were not being gratuitously rendered, and in determining that matter it was proper for them to consider the relations, conversations, and conduct of the respective

parties, together with attending circumstances, including statements made by appellant. Several witnesses,— among them neighboring farmers,—testified that the services rendered were reasonably worth from $25 to $30 per month, in addition to board and lodging. The amount of the verdict is within the issue raised by the pleadings. It is insisted that the evidence does not show that the first conversation about payment for services occurred until months after respondent became twenty-one years of age, and that she cannot recover for the entire time. Respondent, however, did say that it occurred soon after the date of her majority; but she was unable to fix any certain date, and on cross-examination did not, in terms, deny that it might have been some months later. It was, however, for the jury to say, under all the testimony, whether an understanding existed that she was to receive compensation from the time she was twenty-one years of age. The fact that the services were of such an extraordinary character to be rendered by a woman was not improper to consider, together with all the other testimony, in determining whether the presumption that the services were gratuitous during the first few months had been overcome.

We think the court did not err, and the judgment is affirmed.

REAVIS, C. J., and FULLERTON, WHITE, DUNBAR, ANDERS and MOUNT, JJ., concur.